UNITED STATES DISTRICT COURT

Northern District of California

| | |
|---|---|
| MIKE QUAN, JAVIER MAGALLON, | No. C 10-01835 MEJ |
| Plaintiffs, | **ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY** |
| v. | **JUDGMENT** [Dkt. Nos. 40, 41] |
| SAN FRANCISCO POLICE DEPARTMENT, *et al.*, | |
| Defendants. | |
| _____/ | |

## I.  INTRODUCTION

Plaintiffs Mike Quan and Javier Magallon bring this action against the City and County of San Francisco, San Francisco Police Officer Larry Bertrand, former San Francisco Mayor Gavin Newsom,[1] the State of California (acting through the Department of Alcoholic Beverage Control (the ABC")), and ABC Investigator Michelle Ott,[2] asserting claims arising from a enforcement raid that Defendants carried out at Mr. Quan's nightclub on June 19, 2009.  Pending before the Court are the San Francisco Defendants' Motion for Summary Judgment (Dkt. No. 41), and the State Defendants' Motion for Summary Judgment (Dkt. No. 40).  Plaintiffs have filed Oppositions to both Motions (Dkt. Nos. 59, 60).  On October 27, 2011, the Court held oral argument on the matter.  After carefully considering the parties' arguments and thoroughly reviewing the evidence submitted in support, the Court **GRANTS** summary judgment in favor of both the San Francisco Defendants and the State Defendants on all claims.

---

[1]  Collectively, the "San Francisco Defendants."

[2]  Collectively, the "State Defendants."

## II.  BACKGROUND

Mr. Quan is a shareholder of Playbar, Inc. ("Playbar"), which owns and operates a nightclub located in San Francisco called The Room.  Declaration of Mike Quan ¶ 1-2, Dkt. No. 63.  The Room has two levels: a street level and a basement.  *Id.* ¶ 5.  On January 10, 2006, the ABC issued license number 48-433061, which permitted Playbar to sell alcohol in the street level floor of The Room. Declaration of Matthew Botting ¶ 4(A), Dkt. No. 30; Quan Decl. ¶ 5; Declaration of Andrew Omahen ¶ 3, Dkt. No. 31.  In 2006, Mr. Quan began a remodel project of the basement area of the nightclub, with the intention of setting up a bar and dance floor.  Quan Decl. ¶ 7.  Thereafter, in 2008, Mr. Quan, with the assistance of his attorney, Mark Rennie, applied for a premises expansion of The Room's existing ABC license, seeking authorization to sell alcohol in the basement level of The Room. Omahen Decl. ¶ 3 & Exs. 1 & 3; Quan Decl. ¶ 1; Declaration of Mark Rennie ¶ 9, Dkt. No. 62.

Before a request for an informal expansion of an ABC licensed premises can be approved, an applicant must satisfy several requirements, including: submitting ABC Form 257 showing the area of expansion; providing written notice of the planned operation of the premises; the appropriate fee must be paid; and ABC must inspect the premises.  Declaration of Justin Gebb ¶ 4, Dkt. No. 67.  As part of the process, local police and planning departments are notified in order to determine if they have any concerns or objections to the requested expansion of the license.  *Id.* ¶ 8.  For an informal expansion that does not require a new entrance and has not been questioned by local officials, no fee is required and the licensee/applicant is notified in writing and sent a copy of the approved updated ABC Form 257 with a duplicate licence, if needed.  *Id.* ¶ 7.  A formal or informal expansion of ABC licensed premises requires the written approval of the District Administrator.  *Id.* ¶ 9.  This requirement originates from Title 4 of the California Code of California Regulations, section 64.2(b)(1), which provides: "After issuance of transfer of a license, the licensees shall make no changes or alterations of the interior physical arrangements which materially or substantially alter the premises or the usage of the premises from the plan contained in the diagram on file with his application, unless and until prior written assent of the department has been obtained."  *Id.* ¶ 9 (citing 4 Cal. Code Regs. tit. 4, § 64.2(b)(1)).

UNITED STATES DISTRICT COURT
For the Northern District of California

2

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Mr. Quan's request for a premises expansion initially was assigned to ABC Licensing

2   Representative Ross Glen until December 2008, at which time the matter was reassigned to ABC

3   Licensing Representative Andrew Omahen.  Omahen Decl. ¶ 3.

4    The outcome of Mr. Quan's request to expand the license is at the center of this dispute.  Mr.

5   Quan contends that he satisfied all of the requirements for the premises expansion of the ABC license

6   and that representatives from the ABC, including Mr. Glen, indicated that the premises expansion

7   was approved.  *See* Quan Decl. ¶ 13(a).  Accordingly, beginning in January 2009, Mr. Quan began

8   selling liquor in the basement level of The Room.  Quan Decl. ¶ 14.  The San Francisco and State

9   Defendants, however, maintain that Mr. Quan's request for the premises expansion of the license was

10  never approved by the ABC, making any liquor sales in the basement level of The Room illegal.

11    On June 14, 2009, San Francisco police officers responded to reports of a stabbing in the

12  basement of The Room.  Declaration of Michelle Ott ¶ 5, Dkt. No. 37; Quan Decl. ¶ 15.  Following

13  this incident, San Francisco Police Officer Gary Buckner sent Investigator Ott a fax that included a

14  letter he sent to Mr. Quan on June 15, 2009, informing Mr. Quan that The Room was out of

15  compliance with permit conditions set by the San Francisco Entertainment Commission and

16  requesting that the ABC assist SFPD with its enforcement action.  Ott Decl. ¶ 5 & Ex. 1.  Investigator

17  Ott thereafter reviewed the ABC licensing file for The Room and contacted Mr. Omahen about the

18  status of its license.  *Id.* ¶ 6.  Based on her review of the file and her discussion with Mr. Omahen,

19  Investigator Ott concluded that the basement level of The Room was not licensed to sell alcohol.  *Id.*

20  Included in the file was a letter dated February 3, 2009, from Mr. Omahen to Playbar, Inc. (as

21  licensee), identifying the requirements that needed to be fulfilled in order for a licensing

22  determination to be made about the premises expansion of the license to the basement level of The

23  Room.  Ott Decl. ¶ 6; Omahen Decl. ¶ 5 & Ex. 1.  Based on her determination that the basement level

24  of The Room was not licensed to sell alcohol, Investigator Ott decided that an attempt should be

25  made to learn if alcoholic beverages were being sold there.  Ott Decl. ¶ 7.  After obtaining approval

26  from her supervisor, Justin Gebb, who was ABC's District Administrator for San Francisco,

27  Investigator Ott proceeded with the investigation.  *Id.*

28

3

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

On June 19, 2009, Investigator Ott, ABC Investigators Martinez and Anderson, and SFPD Officers Bertrand and Buckner carried out a coordinated investigation of The Room. *Id.* ¶ 8. ABC Investigators Martinez and Anderson entered The Room at around 10:30 p.m. *Id.* ¶ 9. At that time, the basement level of the nightclub was not opened. *Id.* Investigators Martinez and Anderson therefore purchased alcoholic drinks from the bar located on the street level of The Room. *Id.* Soon thereafter, at around 11:39 p.m., Investigator Martinez texted Investigator Ott that he had purchased an alcoholic beverage from the bar in the basement level of the nightclub. *Id.* At that point, Investigator Ott, Ofc. Bertrand, and Ofc. Buckner – who were all in plain clothes – entered The Room and went downstairs to the basement level to observe the activity taking place in that area. *Id.* According to Investigator Ott, there were approximately 60 patrons in the basement level, most of who were either consuming or purchasing alcoholic drinks. *Id.* Investigator Martinez then gave Investigator Ott a sample bottle of the alcoholic beverage that he purchased. *Id.* Investigator Martinez also identified the bartender who sold it to him to Investigator Ott, who was later identified as Mr. Magallon. *Id.* Investigators Martinez and Anderson then left The Room. *Id.*

At that time, Investigator Ott approached Mr. Quan in the upstairs area of the nightclub and verbally identified herself as a law enforcement officer. *Id.* ¶ 9. Investigator Ott then asked Mr. Quan about his knowledge of the basement not being part of the licensed premises. *Id.* ¶ 10. According to Investigator Ott, Mr. Quan responded that he was unaware that it was not licensed and that he thought his attorney had taken care of it recently. *Id.*

Investigator Ott then instructed Mr. Quan that the patrons in the basement level of the nightclub were going to have to be moved to the street level area of the nightclub to allow the officers to complete an inspection and because of officer safety concerns. *Id.* ¶¶ 11, 12. According to Investigator Ott, Mr. Quan elected instead to close the nightclub and directed security personnel to clear everyone out of The Room for the night. *Id.* ¶ 11. Mr. Quan, however, asserts that the officers told him to shut the nightclub down. Quan Decl. ¶ 23.

When Investigator Ott and Mr. Quan went to the basement area of The Room, Investigator Ott approached the bartender who was standing behind the bar – Mr. Magallon – and identified herself as

a law enforcement officer. Ott Decl. ¶13. The parties present conflicting accounts of what transpired next. According to Defendants, Investigator Ott asked Mr. Magallon if he could answer a few questions because he was part of her investigation. Ott Decl. ¶ 13. Mr. Magallon shook his head "no," and said that he did not care who she was and that he did not do anything wrong. *Id*. Investigator Ott replied that if he did not wish to speak with her, he did not have to, but at a minimum she needed to get his basic information, such as his name, birth date, and address for her report. *Id*. According to Investigator Ott, Mr. Magallon refused, became uncooperative, and used vulgar language. *Id*. Specifically, Mr. Magallon loudly said, "my name is Jay and I don't have to do shit . . . actually . . . take me to jail." *Id*. Investigator Ott then told Mr. Magallon that she needed to identify him, and if he did not provide that information, he was going to be detained. *Id*. After Mr. Magallon said to take him to jail, Investigator Ott informed Ofc. Bertrand that Mr. Magallon was being uncooperative and that they needed to detain him and have him calm down for a few minutes. *Id*. Investigator Ott then asked Mr. Magallon to step out from behind the bar and put his hands behind his back. *Id*. At that point, Ofc. Bertrand handcuffed Mr. Magallon and walked him over to a couch. *Id*.

It is undisputed that while seated on the couch, Mr. Magallon slipped his cuffed hands from under his body and got one leg through the cuffs. *Id*. ¶ 14; Declaration of John Devine, Dkt. No. 28, Ex. 1 (Deposition of Javier Magallon) Tr. 151:14-152:3. Upon seeing this, Ofc. Bertrand moved to gain control of Mr. Magallon's upper body, while Investigator Ott moved to gained control of his legs, while Mr. Magallon kicked, twisted, and resisted the officers' attempt to gain control. Ott Decl. ¶ 14. Ofc. Buckner then assisted to gain control of Mr. Magallon's legs. *Id*. Officers Bertrand and Buckner were eventually able to gain control of Mr. Magallon and proceeded to un-handcuff him and place his hand behind his back and re-hundcuff him. *Id*. The officers then told Mr. Magallon that he was under arrest for resisting a peace officer. *Id*. ¶ 15. Officers Bertrand and Buckner and Investigator Ott escorted Mr. Magallon upstairs, while he continued to curse and struggle with the officers and to try to get out of his handcuffs. *Id*. The officers transferred Mr. Magallon to a uniformed officer who had a marked police unit and he was taken to SFPD's southern station to confirm his identity. *Id*. Mr. Magallon was cited for violation of California Penal Code section

5

1   148(a)(1) (obstructing a peace officer) and California Penal Code section 148(a)(1) (resisting a peace

2   officer).

3       Plaintiffs, however, present a different version of what occurred after Investigator Ott and

4   Ofc. Bertrand entered the basement. According to Plaintiffs, soon after the basement level of the

5   nightclub opened, Ofc. Bertrand motioned for Mr. Magallon to come over to him and once Mr.

6   Magallon approached him, he began yelling at Mr. Magallon to stop serving alcohol and to turn off

7   the music. Declaration of Javier Magallon ¶ 9, Dkt. No. 61. Plaintiffs contend that Ofc. Bertrand did

8   not identify himself as a police officer at this point. *Id*. Mr. Magallon responded that he could not

9   turn the music off, but he would stop serving alcohol and then went back to the bar. *Id*. At that point,

10  Investigator Ott approached Mr. Magallon and identified herself as an investigator with the ABC. *Id*.

11  ¶ 11. According to Mr. Magallon, Investigator Ott immediately said to him that she was going to ask

12  him questions and if he refused to answer, she would take him to jail. *Id*. She then asked him about

13  whether the basement was licensed and other questions about the nightclub and repeatedly threatened

14  to take him to jail. *Id*. ¶ 12. In response, Mr. Magallon told Investigator Ott that her attitude was

15  unacceptable and that he was not going to answer any more questions. *Id*. ¶ 13. At that point, Ofc.

16  Bertrand approached Mr. Magallon and both he and Investigator Ott demanded Mr. Magallon's

17  identification. *Id*. ¶ 14. Mr. Magallon responded that he had left for work that night without his

18  wallet and therefore did not have his ID. *Id*.; Quan Decl. ¶ 18(a). Mr. Quan then offered to give the

19  officers a copy of Mr. Magallon's identification that he kept in his office upstairs. Magallon Decl. ¶

20  14. Investigator Ott then asked Mr. Magallon his name, and he responded that it was "Javier." *Id*. ¶

21  15. Officer Bertrand yelled that he was lying because he heard another employee call him "Jay." *Id*.

22  Mr. Magallon explained that his name is Javier, but his friends call him Jay. *Id*. The officers then

23  threatened to take Mr. Magallon to jail, to which he said that he did not care and they could take him

24  to jail. *Id*. Officer Bertrand called Mr. Magallon a liar and came around the bar and handcuffed him.

25  *Id*. ¶ 17. Mr. Magallon told him that he had a bad shoulder and to be careful, but Ofc. Bertrand

26  proceeded to handcuff him and seated him on the couch in the middle of the room. *Id*.

27       At that point, Mr. Magallon told Ofc. Bertrand that he was physically incapable of sitting on

28

UNITED STATES DISTRICT COURT
For the Northern District of California

the couch with the handcuffs placed behind his back and asked that they be placed in front of his body, but Ofc. Bertrand refused. *Id*. To alleviate the pain, Mr. Magallon placed one leg through his hands and sat with one leg on the cuffs. *Id*. ¶ 18. According to Mr. Magallon, when Ofc. Bertrand saw this, he threw Mr. Magallon down on the couch, placed his leg on Mr. Magallon's neck, and slammed his leg into Mr. Magallon's face *Id*. At some point Investigator Ott came over and assisted Ofc. Bertrand. *Id*. Together, they eventually forced Mr. Magallon's hands behind his back. *Id*. Mr. Magallon was then taken to jail. Mr. Magallon claims that as a result of the force the officers used, he suffered physical injuries, including cuts to his mouth, a strained neck, a sore jaw, bruises, and numbness to his wrist that lasted for two weeks. *Id*. ¶ 20. Additionally, he claims that he suffered psychological trauma, including difficulty sleeping and could not return to work for a period of time. *Id*. ¶ 21.

After Mr. Magallon was taken away, Investigator Ott resumed her inspection of the bar. Ott Decl. ¶ 16. Her inspection yielded 35 bottles of distilled spirits that had contaminants in them. *Id*. She advised Mr. Quan that she would be seizing all of the unopened bottles of distilled spirits and would be keeping seven of them as a representative sample. *Id*. Investigator Ott asked Mr. Quan if he wanted her to seize the rest of the contaminated bottles as evidence of to dispose of them at that time, to which Mr. Quan responded that she should pour them out. *Id*. Investigator Ott filled out three ABC-320 Evidence/Property Receipt/Reports and had Mr. Quan sign them. Ott Decl. ¶ 17 & Ex. 3. Mr Quan was issued an ABC citation #66471 for violating California Business & professions Code section 23300 (Sales of an Alcoholic Beverage Without a License), California Business & Professions Code section 23355 (Exceeding License Privileges), and California Penal Code section 347(b) (Poisonous Alcoholic Solutions). Mr. Quan signed the citation and was released at the scene.

On March 29, 2010, Plaintiffs filed this action in San Francisco Superior Court. Dkt. No. 1. On April 28, 2010, the San Francisco Defendants removed the action to this Court based on federal question jurisdiction. *Id*. In their Complaint, Plaintiffs assert claims for: (1) assault and battery,

wrongful arrest, and kidnapping (collectively, Count One);[3] (2) fraud by mail, unlawful interruption of business, abuse of police power, and destruction and theft of property (Count Two); and (3) violation of federal Racketeer Influenced and Corrupt Organizations law ("RICO"), 18 U.S.C. § 1962(c) (Count Three).[4]  Dkt. No. 1., Ex. B.  The San Francisco Defendants and the State Defendants move for summary judgment on all claims.

### III.  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), the Court shall grant summary judgment as to any claim or defense if the movant, by citing to particular parts of materials in the record, shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)[5]; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A fact is material if, under the substantive law  governing the claim or defense at issue, the fact is critical and might the outcome of the case.  *See Anderson*, at 248.  A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *See id.* at 248-49.

The party moving for summary judgment has the initial burden of citing to particular parts of materials in the record, including portions of the pleadings, discovery and disclosures on file, and affidavits, that demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323.  When the nonmoving party has the burden of proof at trial, the movant need point out only "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  If the movant meets this initial burden, the non-moving party must go beyond the pleadings and-by its own affidavits or discovery-set forth specific facts showing a genuine issue for trial.  *See*

---

[3]  Although Plaintiffs assert multiple claims, they group them into three counts.

[4]  Count One is asserted by Mr. Magallon, Count Two is asserted by Mr. Quan, and Count Three is asserted by both Plaintiffs.

[5]  On December 1, 2010, a revised version of Rule 56 took effect.  While portions of former Rule 56 have been amended, the Committee notes to the 2010 Amendments to Rule 56 indicate that the standard for granting summary judgment remained unchanged and does not affect court decisions construing and applying the language of Rule 56.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

*Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  If the non-moving party does not produce evidence to show a genuine dispute as to a material fact, the moving party is entitled to summary judgment.  *See Celotex*, 477 U.S. at 323.  In ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in the light most favorable to the non-moving party.  *See Matsushita*, 475 U.S. at 587.

## IV.   DISCUSSION

**A.     The Status and Scope of The Room's ABC License on June 19, 2009**

The threshold dispute in this matter centers on whether the basement of The Room was properly licensed for the sale of alcohol on June 19, 2009.  Plaintiffs assert that the ABC approved Playbar's request for an informal expansion of The Room's ABC license to cover the basement portion of the nightclub in 2008.  They therefore argue that the ABC and SFPD officers had no legal basis to carry out their raid on the nightclub.  The San Francisco and State Defendants, however, maintain that while Mr. Quan may have started the process for an informal expansion of The Room's ABC license, the expansion was never approved, so any sales in the basement level on or before June 19, 2009 were illegal.  Reviewing the record evidence, the Court agrees with Defendants.

In support of their position, Defendants provide testimony from several ABC and SFPD officers indicating that, although Mr. Quan may have been in the process of applying for an informal expansion of Playbar's existing ABC license to cover the basement area of the nightclub, ABC never approved the expansion or issued a license covering it.  First, the State Defendants have submitted testimony from Andrew Omahen, who was the ABC licensing representative who took over The Room's file from Mr. Glen.  Mr. Omahen testifies that after reviewing the Playbar's file, and based on Mr. Glen's notes, he determined that the request was still pending as of February 2009.  Omahen Decl. ¶ 4.  As a result, Mr. Omahen sent Playbar a letter on February 3, 2009, informing it of the additional documents that the ABC would need to make a decision on the request.  *Id*. ¶ 5 & Ex. 1.  The letter expressly stated that "in order to continue with and complete the premises expansion," certain documents were needed, including an ABC Form 255 zoning affidavit, ABC Form 257 licensed premises diagram, and a letter requesting the changes to the premises.  *Id*.  On the same day,

9

UNITED STATES DISTRICT COURT
For the Northern District of California

Mr. Omahen sent a letter to Inspector Falzon of the SFPD Vice Crimes Division informing him that Playbar was applying for a premises expansion with the ABC and requesting that Inspector Falzon let him know if the SFPD has any problems with the intended expansion. *Id*. ¶ 6 & Ex. 2. Thereafter, on February 5, 2009 Mr. Omahen had a telephone conversations with Mr. Rennie and on and March 20, 2009, he had another conversation by phone with by Mr. Rennie and Mr. Quan, during which time they discussed the documents needed to allow the ABC to make a decision. *Id*. & Ex. 3. Mr. Omahen testifies that in early April 2009, he received a letter from Mr. Rennie in response to his earlier letter listing documents that needed to be submitted. *Id*. & Ex. 4. Subsequently, at some point before June 19, 2009, Mr. Omahen spoke with Investigator Ott and informed her that the license for the basement portion of The Room had not been approved. *Id*. ¶ 10.

The State Defendants have also proffered testimony from Matthew Botting, General Counsel for the ABC, who states that the official ABC business records relating to Playbar indicate that at no time during which Playbar's ABC license number 48-433061 was in effect – specifically, January 10, 2006 until its cancellation on November 24, 2010 – did it encompass the basement area of the premises  Botting Decl. ¶ 4(a), Dkt. No. 36.

In addition, the San Francisco Defendants have submitted testimony from SFPD Inspector David Falzon, who is SFPD's liaison to the ABC. Declaration of David Falzon Decl. ¶ 2, Dkt. No. 35. Inspector Falzon testifies that the SFPD does not have authority to issue or deny a license to serve alcohol in San Francisco, but the ABC communicates with the SFPD regarding requests for, and action on, applications for alcohol permits. *Id*. ¶ 3. He explains that before the ABC can make this determination, the ABC needs a finding from the local governing body, the Board of Supervisors, which is required to hold a hearing called a "Public Convenience and Necessity" hearing. *Id*. ¶ 5. The findings are then forwarded to the ABC before the ABC can approve the transfer. *Id*. Inspector Falzon testifies that the Board of Supervisors did not hold a Public Convenience and Necessity hearing regarding the expansion of the license to serve alcohol at The Room until September 2010, at which time it approved the Premises to Premises Transfer. *Id*. ¶ 6. Falzon thus testifies that at no time prior to September 2010 – including June 19, 2009 – did The Room have the legal authority to

10

1    serve alcohol in the basement level.  *Id*.

2         The State Defendants also proffer testimony from Justin Gebb, the ABC District

3    Administrator for San Francisco, who is responsible for reviewing and approving applications for

4    expansions of ABC licensed premises in San Francisco under Rule 64.2 of the ABC regulations.

5    Declaration of Justin Gebb ¶¶ 2-3, Dkt. No. 67.  Mr. Gebb states that there is no ABC record of any

6    written approval by a District Administrator of an application for premises expansion of The Room

7    prior to June 20, 2009.  *Id*. ¶ 10.  Mr. Gebb also explains that without a final written approval, no

8    duplicate license would have been issued for the basement portion of The Room, which would have

9    been required under California Business & Professions Code sections 24042 and 24046 because each

10   validly licensed bar serving distilled spirits within an establishment that is divided by a physical

11   barrier (such as flooring or a wall) must have its own license posted.  *Id*. ¶ 12.  Further, Mr. Gebb

12   states that Mr. Glen had no authority to issue any approval of an expansion request.  *Id*. ¶ 11.

13        Plaintiffs, on the other hand, assert that the evidence establishes that the basement was

14   properly licensed, or alternatively, that they have presented sufficient evidence to raise triable issue

15   on whether approval was given.  In support, Plaintiffs submit testimony from Mr. Quan and Playbar's

16   lawyer who handled the informal expansion request, Mr. Rennie.  According to Mr. Rennie, he met

17   with Donna Campbell of the ABC on March 24, 2008, at which time Ms. Campbell approved the

18   informal request and indicated that he needed to get her a letter of intention, pay a fee, complete a

19   premises inspection, and that sprinklers needed to be installed in the basement.  Rennie Decl. ¶ 9.

20   Mr. Quan testifies that he sent the Form 257 and the letter of intention in April 2008, and paid the

21   duplicate license fee on June 24, 2008.  Quan Decl. ¶ 13(c), (d).  According to Mr. Rennie, at some

22   point between April 2008 and June 24, 2008, he was told by Officer Manning of the San Francisco

23   Police Department that her department was approving the expansion.  Rennie Decl. ¶ 12.  He also

24   states that he was informed by "someone at the ABC that, once the sprinklers were installed Glen had

25   done an inspection.  Therefore, the requirements had been met for the license in June of 2008."  *Id*. ¶

26   13.  Mr. Rennie testifies that between June and August 2008, he kept calling Mr. Glen and requesting

27   that the expansion be approved, but never received a call back.  *Id*. ¶ 14.  Thereafter, on August 25,

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

2008, Mr. Rennie and Mr. Quan were at the ABC when they ran into Mr. Glen, and after Mr. Rennie asked about the status of the license, Mr. Glen stated that the inspection had been completed and the fee for the duplicate license had been received and said to Mr. Quan, "congratulations, you are good to go." *Id.* ¶ 15; Quan Decl. ¶ 13(e).  Based on that interaction, Mr. Rennie told Mr. Quan that the basement was now licensed for sales, service and consumption of alcohol.  *Id.* ¶ 16.

Mr. Rennie testifies that later, on February 3, 2009, he received a call from Mr. Omahen who informed him that Mr. Glen had left the ABC and that he was reviewing The Room's file.  Rennie Decl. ¶ 18.  Mr. Omahen indicated that he needed to get a new Form 257 because the form previously submitted was on two pages and asked for a letter from the licensee, which Mr. Rennie informed him was already in the file.  Rennie Decl. ¶ 18.  Mr. Rennie states that, "[d]uring the conversation, I was never told that the license was not in force, and I informed Mr. Omahen that Mr. Quan was serving alcohol in the basement because we thought it was licensed."  *Id.* ¶ 19.  Mr. Rennie filed the new Form 257 in April 2009.  *Id.*

The Court has carefully considered the parties' arguments and reviewed the record evidence, and finds that Plaintiffs have failed to proffer evidence demonstrating that Playbar's request for informal expansion had been approved prior to June 19, 2009.  Although Mr. Rennie and Mr. Quan testify as to the steps they took toward requesting the expansion, they have presented no evidence that they received written approval of the informal premises expansion from the ABC's district administrator, as required under Title 4 of the California Code of Regulations, section 64.2(b)(1).  While Plaintiffs rely on an oral statement from Ms. Campbell indicating that the request was approved, Plaintiffs acknowledge that Ms. Campbell contemporaneously informed Mr. Rennie that Playbar was required to submit additional documents and meet certain requirements.  Moreover, it is undisputed that in February 2009, Mr. Omahen contacted Mr. Rennie to advise him that certain documents and requirements still needed to be met before the ABC could make a determination on the request.  In fact, Mr. Omahen's letter expressly stated that, "In order to continue with and complete the premises expansion, the following items are needed[.]" *See* Ott Decl., Ex. 2.  Thus, even if Plaintiffs believed that Playbar's request for informal premises expansion to the basement area had

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1  been approved earlier in 2008, Mr. Omahen's call and written correspondence put Plaintiffs on notice

2  that the license had not been extended.  Likewise, even if Ofc. Manning of the SFPD conveyed that

3  the SFPD was approving the request, Plaintiffs failed to explain or offer any authority indicating that

4  SFPD had the authority to grant final approval of the request for informal expansion.  To the

5  contrary, Inspector Falzon has testified that SFPD merely offers its recommendation to the ABC on

6  what action to take an ABC license applications and modifications.

7       In sum, Plaintiffs have failed to proffer any facts indicating that Playbar ever obtained

8  approval from the ABC to expand the license to the basement level of The Room.  The

9  uncontroverted evidence demonstrates that the request remained outstanding in 2009 and that

10 Plaintiffs were advised of this before the June 19, 2009 incident involving alcohol sales in the

11 basement level.

12      The Court now turns to Plaintiffs' claims.

13 **B.     Count One: Assault and Battery, Wrongful Arrest, and Kidnapping**

14      In Count One, Mr. Magallon asserts claims for assault and battery, wrongful arrest, and

15 kidnapping, stemming from his interactions with the ABC and SFPD officers on June 19, 2009.

16 Compl. at 4-6.  He asserts that the officers lacked any legal basis to detain or arrest him and used

17 unreasonable force against him.  The San Francisco and State Defendants counter that the officers

18 had reasonable suspicion to initially detain Mr. Magallon and probable cause to arrest him and never

19 utilized unreasonable force in detaining Mr. Magallon.  Having carefully considered the parties'

20 arguments, the Court agrees with Defendants.

21      1.     Wrongful Arrest

22      "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government,

23 and its protections extend to brief investigatory stops of persons or vehicles that fall short of

24 traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) ( citing *Terry v. Ohio*, 392 U.S.

25 1, 9 (1968)).  Peace officers may conduct a brief, investigatory search or seizure, so long as they have

26 a reasonable, articulable suspicion that "criminal activity may be afoot."  *Terry*, 392 U.S. at 30.  The

27 reasonable suspicion standard "is a less demanding standard than probable cause," and merely

28

requires "a minimal level of objective justification." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). In determining whether reasonable suspicion existed, courts must look at the "totality of the circumstances" of each case to see whether the detaining officer had a particularized and objective basis for suspecting legal wrongdoing. *Arvizu*, 534 U.S. at 751 ( citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

The Fourth Amendment prohibits arrests without probable cause or other justification, and provides: "The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing ... the persons or things to be seized." U.S. Constitution, amend. IV.  A claim for unlawful arrest is cognizable when the arrest is alleged to have been made without probable cause. *Dubner v. City & County of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001).  "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023 (9th Cir. 2009) (quoting *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007)).

In addition, allegations of excessive force during an arrest are analyzed under a Fourth Amendment standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989) ("claim[s] that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure'... are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard"); *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) ("the use of force to effect an arrest is subject to the Fourth Amendment's prohibition on unreasonable seizures").

In their Motions, Defendants assert that the evidence establishes that Ofc. Bertrand and Investigator Ott had reasonable suspicion that Mr. Magallon was engaging in criminal activity to justify the officers' initial detention of Mr. Magallon.  In support, Defendants proffer that prior to the investigation on June 19, 2009, Investigator Ott had researched the status of The Room's ABC license for alcohol sale in the basement level by reviewing The Room's ABC file and discussing the

14

UNITED STATES DISTRICT COURT
For the Northern District of California

1  matter with Mr. Omahen and based on her research, properly determined that The Room was not

2  licensed to sell alcohol in the basement level.  Thereafter, on June 19, 2009, Investigator Ott and Ofc.

3  Bertrand received information from Investigator Martinez that he had purchased an alcoholic

4  beverage from the bartender in the basement level of the nightclub.  When Investigator Ott, Ofc.

5  Bertrand, and Ofc. Bertrand entered the basement level of The Room, Investigator Martinez gave

6  Investigator Ott a sample of the alcoholic beverage he had purchased and identified the bartender

7  who sold it to him.  Defendants assert that based on these undisputed facts, the officers had

8  reasonable suspicion to detain Mr. Magallon for violation of Business and Professions Code sections

9  23300[6] and 23355.[7]  Further, the San Francisco Defendants argue that based on these facts known to

10 the officers, there was probable cause to arrest Mr. Magallon for selling alcoholic beverages without

11 a valid license.  SF Def. Mot. at 8 (citing *People v. Guinn*, 149 Cal. App. 3d Supp. 1 (1983) (offense

12 of selling alcoholic beverages without a valid license is a strict liability, malum prohibitum offense).

13     Mr. Magallon, however, maintains that there is factual dispute as to whether reasonable

14 suspicion existed.   He proffers his testimony that while he was serving alcohol in the basement of

15 The Room, he believed the nightclub was legally licensed to do so.  Pl. Opp. to SF Def. Mot., Dkt.

16 No. 59 at 6.  Mr. Magallon argues that "the officers did nothing more than look at Mr. Quan's ABC

17 file, and discuss the status of the license with Mr. Omahen of the ABC, before conducting this raid."

18 *Id*.  Mr. Magallon asserts that while Mr. Omahen indicated that the basement was not licensed, there

19 was evidence that the basement was licensed.  *Id*.

20     The court has carefully considered Mr. Magallon's arguments and proffered evidence and

21 finds that Mr. Magallon has failed to meet his burden of establishing that a factual dispute exists as to

22

23     [6] Section 23300 provides: "No person shall exercise the privilege or perform any act which a

24 licensee may exercise or perform under the authority of a license unless the person is authorized to

   do so by a license issued pursuant to this division."

25

26     [7] Section 23355 provides: "Except as otherwise provided in this division and subject to the

27 provisions of Section 22 of Article XX of the Constitution, the licenses provided for in Article 2 of

   this chapter authorize the person to whom issued to exercise the rights and privileges specified in

28 this article and no others at the premises for which issued during the year for which issued."

**UNITED STATES DISTRICT COURT**
For the Northern District of California

whether the officers had reasonable suspicion to detain him.  First, as discussed above, the record evidence in this case demonstrates that on June 19, 2009, The Room's ABC license did not extend to the basement area of the premises.  Second, Defendants have identified specific, articulable facts indicating that Mr. Magallon was committing a violation of Business and Professions Code sections 233000 and 23355 by selling alcohol in the basement level of The Room on June 19, 2009.  Specifically, while outside The Room on June 19, 2009, Investigator Ott and Ofc. Bertrand received contemporaneous information from undercover ABC Investigator Martinez who purchased alcoholic beverages from Mr. Magallon in the basement of the nightclub.  This information provided a sufficient basis for the officers to detain Mr. Magallon for violation of sections 233000 and 23355.  Whether Mr. Magallon subjectively believed that the basement level of The Room was properly licensed for alcohol sales does not refute the information Investigator Ott and Ofc. Bertrand had before them indicating that the basement level of The Room lacked a proper ABC permit and that Mr. Magallon  was the bartender who sold alcoholic beverages to Investigator Martinez.  Notably, Mr. Magallon has not cited any authority indicating that his personal belief that he was engaging in lawful behavior refutes facts known to officer for purposes of determining whether reasonable suspicion exists.  The Court therefore finds that Defendants have demonstrated that their initial detention of Mr. Magallon was supported by reasonable suspicion.

The San Francisco and State Defendants further contend that reasonable suspicion existed to detain Mr. Magallon  for violation of California Penal Code section 148.9(a) and Penal Code section 148(a)(1).  Section148.9(a) provides:

> Any person who falsely represents or identifies himself or herself as another person or as a fictitious person to any peace officer listed in Section 830.1 or 830.2, or subdivision (a) of Section 830.33, upon a lawful detention or arrest of the person, either to evade the process of the court, or to evade the proper identification of the person by the investigating officer is guilty of a misdemeanor.

Section 148(a)(1) provides:

> (a)(1) Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.

The San Francisco Defendants argue that when Mr. Magallon responded to the officers' requests for his

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1  name, they had reasonable suspicion to detain him and investigate him for violation of Penal Code

2  section 148.9(a).  Specifically, while Mr. Magallon stated that his name was "Javier Magallon," Ofc.

3  Bertrand heard others calling him "Jay."  Defendants also argue that when Mr. Magallon repeatedly

4  refused to cooperate in the investigation by cursing at Investigator Ott, getting belligerent, and failing

5  to produce valid identification, the officers were entitled to detain and handcuff him for their safety and

6  the safety of others and to detain and arrest him for violation of California Penal Code section 148(a)(1)

7  for resisting the officers.  SF Def. Mot. at 9, Dkt. No. 41.  They further contend that when Mr. Magallon

8  slipped his handcuffs by stepping through them with his leg and moved his hands toward the front of his

9  body, and then physically resisted Investigator Ott and Ofc. Bertrand, there was additional reasonable

10  suspicion and probable cause to detain and arrest him for violation of Penal Code section 148.  *Id.*

11  Mr. Magallon, however, contends that there are factual disputes on this issue.  In support, he

12  proffers that the record evidence demonstrates that, although he did not have identification, he correctly

13  identified himself to the officers.  He also proffers that there is evidence that Mr. Quan confirmed his

14  identity to the officers and offered to get a copy of his license kept in the upstairs office.

15  Again, Mr. Magallon's evidence fails to create a triable issue of fact.  Mr. Magallon testified that

16  he got upset and shouted during Investigator Ott's questioning.  Devine Decl., Ex. 1, Magallon Depo.

17  117:4-7.  While Mr. Magallon points to evidence that he truthfully identified himself to the officers, this

18  evidence supports the officers' assertion that there was some basis to believe that Mr. Magallon had

19  provided false information regarding his identity to the officers after Ofc. Bertrand heard another person

20  calling Mr. Magallon "Jay."  Moreover, Mr. Magallon testified that during Investigator Ott's questioning,

21  he became upset and told Investigator Ott, "I don't give a fuck, and "take me to jail," and then refused

22  to talk to Investigator Ott.  Bonta Decl., Dkt. No. 33, Ex. D, Magallon Depo. 116:21-117:13.  Thus, the

23  record evidence demonstrates that at the point when Ofc. Bertrand and Investigator Ott asked Mr.

24  Magallon his name and overheard others referring to him by a different name, Ofc. Bertrand and

25  Investigator Ott had reasonable suspicion to further detain Mr. Magallon and investigate him for violation

26  of Penal Code section 148.9(a).  Moreover, after Mr. Magallon refused to cooperate in the investigation

27  by yelling and swearing at Investigator Ott, Ofc. Bertrand and Investigator Ott had reasonable suspicion

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   to detain and handcuff him for their safety and arrest him for violation of Penal Code section 148.

2   Finally, Mr. Magallon does not dispute that after he was handcuffed, slipped his left leg through the

3   handcuffs or that he struggled with the officers when they attempted to restrain him after he shifted his

4   cuffs.  Magallon Decl. ¶ 18; Magallon Depo. 95:10-965.  Thus, the Court agrees with Defendants that

5   the uncontested evidence establishes that Ofc. Bertrand and Investigator Ott had reasonable suspicion

6   to detain Mr. Magallon and probable cause to arrest him for violation of Penal Code section 148.

7        In sum, the Court finds that Defendants have demonstrated that the record evidence establishes

8   that Investigator Ott and Ofc. Bertrand's detention of Mr. Magallon was supported by reasonable

9   suspicion and their arrest of Mr. Magallon for violation of Penal Code section 148 was supported by

10  probable cause.  The Court therefore **GRANTS** summary judgment in favor of Defendants on Mr.

11  Magallon's wrongful arrest claim.

12        2.    Qualified Immunity

13       The San Francisco Defendants argue that even if Ofc. Bertrand did not have reasonable suspicion

14  to detain or probable cause to arrest Mr. Magallon, he is protected by qualified immunity because clearly

15  established law does not show that he violated the Fourth Amendment and any mistake of fact or law was

16  reasonable under the circumstances.  SF Def. Mot. at 10.

17       To determine whether an official is entitled to qualified immunity the court engages in a two-party

18  inquiry.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  First, the court must determine whether the facts

19  alleged, when taken in the light most favorable to the plaintiff, establish that the defendant's conduct

20  violated a statutory or constitutional right.  *Id*.  Second, the court must decide whether that right was

21  "clearly established."  *Id*.  A right is clearly established if "it would be clear to a reasonable [official] that

22  his conduct was unlawful in the situation he confronted ... or whether the state of the law [at the time of

23  the violation] gave fair warning to the official[ ] that [his] conduct was [unlawful]."  *Clement v. Gomez*,

24  298 F.3d 898, 906 (9th Cir. 2002) (internal quotation marks and citations omitted).  This does not require

25  that the same factual situation must have been decided, but that existing precedent would establish the

26  statutory or constitutional question beyond debate.  *Id.*; *Nelson v. City of Davis*, 685 F.3d 867, 884 (9th

27  Cir. 2012).  "The linchpin of qualified immunity is the reasonableness of the official's conduct."

28

1   *Rosenbaum v. Washoe County*, 654 F.3d 1001, 1006 (9th Cir. 2011).

2        If the defendant's conduct did not violate a statutory or constitutional right or if that right was not

3   "clearly established," the defendant is entitled to qualified immunity. *See Saucier*, 533 U.S. at 201–02.

4   The Court may consider these two steps in any order. *See Pearson v. Callahan*, 555 U.S. 223, 236

5   (2009). If at any point the court is able to answer either prong in the negative, the defendant is entitled

6   to qualified immunity. *See, e.g., Tibbetts v. Kulongoski*, 567 F.3d 529, 536 - 39 (9th Cir. 2009)

7   (bypassing the first prong and granting the defendants qualified immunity because the plaintiff's due

8   process right was not clearly established).

9        Here, the San Francisco Defendants argue that clearly established law does not show that, under

10  the undisputed facts, Ofc. Bertrand could not lawfully detain or arrest Mr. Magallon for violation of

11  Business & Professions Code section 23300 (acting without a license), Business and Professions Code

12  section 23355 (unlicensed actions), Penal Code section 148 (resisting, delaying, obstructing), and/or

13  California Penal Code section 148.9(a) (falsely representing or identifying oneself to a peace officer).

14  SF Def. Mot. at 11. Plaintiffs respond that "there is substantial evidence to prove . . . that these officers'

15  conduct was unlawful." Opp'n to SF Def. at 8. Specifically, Plaintiffs submit the following argument:

16          Plaintiffs provide evidence that these officers raided a club which, based upon the
         ABC's own file, was properly licensed. If it was not licensed, which is not admitted, then
17       at the very least the ABC's file showed that Mr. Quan made a good faith effort to get
         licensed, and was informed by the appropriate ABC representative that he was licensed.
18       Instead of calling Mr. Quan, or investigating further, these officers raided his club, were
         abusive with customers and staff, and while conducting the raid, physically assaulted one
19       of Mr. Quan's employees, without probable cause. Lastly, the officers confiscated
         alcohol and sound equipment without any possible justification, and an officer struck Mr.
20       Magallon when he was handcuffed in a police car. (Decl. of Quan ¶ 17-18; Decl. of
         Magallon ¶¶ 11-19; *See also Levine v. City of New York*, (1995) 38 ATLA L. Rptr No. 10
21       368 to 369.)

22  Pl. Opp to SF Def. Mot. at 7. Based on the foregoing argument, Plaintiffs assert that both Ofc. Bertrand

23  and Investigator Ott's conduct "was clearly illegal," thereby preventing a finding that qualified immunity

24  applies.

25       Plaintiffs' argument, however, misses the mark. Plaintiffs have failed to cite any case law

26  indicating that the officers' decision to detain Mr. Magallon was unreasonable after the officers had

27  determined that the basement was not properly licensed and Investigator Martinez reported that Mr.

28

19

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Magallon was selling alcohol in the basement area.  Further, Plaintiffs have failed to cite any authority

2  indicating that Ofc. Bertrand's decision to further detain Mr. Magallon for possible violation of Penal

3  Code section 148.9(a) to determine whether he had accurately identified himself after Ofc. Bertrand

4  overheard someone calling Mr. Magallon by a different name was unreasonable.  Finally, Plaintiffs have

5  failed to cite any authority indicating that after Mr. Magallon slipped him handcuffs and struggled with

6  the officers, their decision to arrest him for violation of Penal Code section 148 for resisting a police

7  officer was unreasonable.  The Court therefore finds that Plaintiffs have failed to demonstrate that it

8  should have been clear to Ofc. Bertrand that his detention and arrest of Mr. Magallon was unlawful in

9  the situations he confronted.  Accordingly, Ofc. Bertrand is entitled to qualified immunity.

10         3.       Assault and Battery Claim

11         The San Francisco Defendants next move for summary judgment on Mr. Magallon's assault and

12  battery claim, arguing that summary judgment is appropriate because Ofc. Bertrand's use of force was

13  reasonable and protected under Penal Code section 835a.[8]  SF Def. Mot. at 12.

14         Penal Code section 835a provides:

15         Any peace officer who has reasonable cause to believe that the person to be arrested has
           committed a public offense may use reasonable force to effect the arrest, to prevent
16         escape or overcome resistance.

17         A peace officer who makes or attempts to make an arrest need not retreat or desist from
           his efforts by reason of the resistance or threatened resistance of the person being
18         arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense
           by the use of reasonable force to effect the arrest or to prevent escape or to overcome
19         resistance

20
    Defendants argue that, under California law, the Penal Code privileges defeat liability for peace officer
21
    use of force under any tort theory, including assault and battery.  SF Def. Mot. at 12.
22
           In response, Plaintiffs argue that there are factual disputes preventing summary judgment on Mr.
23
    Magallon's assault and battery claim.  Specifically, Plaintiffs argue that the officers lacked probable
24

25  _____

26         [8]  In their Motion, the State Defendants contend that Mr. Magallon did not expressly make
    any excessive force claim against Investigator Ott.  State Def. Mot. at 21 n2.  Plaintiffs did not
27  oppose this argument.  The Court therefore treats the assault and battery claim as against Ofc.
    Bertrand only.
28

cause to arrest Mr. Magallon; the force used by the officers was unreasonable; and "[t]he officers' overall actions were illegal and therefore not protected by California Penal Code section 835a." Pl. Opp to SF Def. at 9. To support this argument, Plaintiffs refer generally to the declarations of Mr. Quan, Mr. Magallon, and Mr. Warren, but fail to proffer any citation to any specific testimony or facts contained in those documents. Plaintiffs make no other attempt to articulate how Ofc. Bertrand's actions were unreasonable or excessive.

As Defendants point out, Mr. Magallon admits that after Ofc. Bertrand handcuffed him and instructed him to sit on the couch in the basement, Mr. Magallon slipped one leg through his handcuffs, thereby moving his hands to the front of his body. Magallon Decl. ¶ 18; Magallon Depo. 150:17-151:2, 151:14-152:3. Thus, there is no dispute that while seated, Mr. Magallon was attempting to increase his mobility or otherwise lessen the restraint provided by the handcuffs. There is also uncontroverted testimony from Ofc. Bertrand and Investigator Ott that after Mr. Magallon slipped his cuffs, Ofc. Bertrand attempted to gain control of Mr. Magallon's upper body, but Mr. Magallon resisted by kicking and twisting while he was on the couch. The record thus contains uncontroverted evidence that Mr. Magallon resisted the officers' attempt to restrain him after he slipped the handcuffs to the front of his body. Moreover, Mr. Magallon testified that he did not suffer any physical injuries that prevented him from working as a result of arrest by Ofc. Bertrand and did not seek any medical treatment for any injuries he sustained as a result of his interaction with Ofc. Bertrand. Magallon Depo. 139:8-19, Doc. No. 33, Ex. D. There is no evidence that Ofc. Bertrand applied more force than necessary to restrain Mr. Magallon while attempting to re-secure him in handcuffs. Based on the foregoing evidence, the Court finds that Defendants have demonstrated that any force used by Ofc. Bertrand to restrain Mr. Magallon was reasonable in light of the circumstances. Ofc. Bertrand is therefore protected by Penal Code section 835a. Furthermore, as indicated above, Plaintiffs have failed to identify evidence in the record supporting their assault and battery claim. Accordingly, the Court **GRANTS** summary judgment in favor of all Defendants on Mr. Magallon's assault and battery claim.

4.      Kidnapping Claim

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   The San Francisco Defendants next move for summary judgment on Mr. Magallon's kidnapping

2   claim against Ofc. Bertrand.  Defendants argue that California law does not authorize a private cause of

3   action for kidnapping.  Further, the San Francisco Defendants contend that Penal Code section 207

4   exempts police officers committing lawful arrests from kidnapping.  The Court agrees with Defendants.

5   Plaintiff has failed to cite any authority recognizing a private right of action for kidnapping under

6   California law.  *See Phillips v. City and County of San Francisco*, 2011 WL835508, at *7 (N.D. Cal. Mar.

7   4, 2011) (granting summary judgment in favor of defendants on kidnapping claim because no claim is

8   authorized under section 207).  The Court therefore **GRANTS** summary judgment in favor of all

9   Defendants on this claim.

10  **C.    Mr. Quan's Claims for Fraud by Mail, Unlawful Interruption of Business Opportunities,**
         **Abuse of Police Power, and Destruction and Theft of Property**

11          1.    Fraud by Mail

12  In their Complaint, Plaintiffs allege that Defendants committed mail fraud on Mr. Quan by using

13  the mail and/or email to inform him of the "fraudulent charge" of an infraction on June 19, 2009 for

14  "serving poisonous beverages," which was later dismissed.  Compl. ¶¶ 30-31.

15  The San Francisco Defendants move for summary judgment on this claim on the ground that 18

16  U.S.C. § 1341 does not confer a private right of action.  SF Def. Mot. at 20.  Plaintiffs counter that Mr.

17  Quan's mail fraud claim "is a predicate act under a civil RICO claim, so there is a private right of action."

18  Pl. Opp. to SF Def., Dkt. No. 59 at 12.  While Plaintiffs are correct that mail fraud mail serve as a

19  predicate act for purposes of a civil RICO claim, Plaintiffs fail to cite any authority recognizing mail

20  fraud as a private right of action.  *See  Wilcox v. First Interstate Bank*, 815 F.2d 522, 533 n. 1 (9th Cir.

21  1987) ("Other than in the context of RICO, federal appellate courts hold that there is no private right of

22  action for mail fraud under 18 U.S.C. § 1341.").  Accordingly, the Court **GRANTS** summary judgment

23  in favor of all Defendants on this claim.

24  / / /

25  / / /

26  / / /

27          2.    Unlawful Interruption of Business Opportunities, Abuse of Police Power, Destruction and
                  Theft of Property claims

28

22

The San Francisco Defendants next contend that they are entitled to summary judgment on Mr. Quan's claims for unlawful interruption of business opportunities, abuse of police power, and destruction and theft of property. SF Def. Mot. at 21. They argue that Mr. Quan has failed to identity the statutory bases for the claims and pursuant to California Government Code section 815, liability against government actors must be based on statute.

In response, Mr. Quan argues that there are triable issues of fact as to each of the claims. Mr. Quan, however, fails to cite any authority recognizing these claims as cognizable against government defendants. Accordingly, the Court **GRANTS** summary judgment in favor of all Defendants on Mr. Quan's claims for interruption of business activities, abuse of police power, and destruction and theft of property.

In the same vein, the State Defendants argue that they are entitled to summary judgment on Mr. Quan's second claim because no statute authorizes an action for a constitutional or other violation based on denial, suspension, or revocation of a liquor license. State Def. Mot. at 14, Dkt. No. 40. In response, Mr. Quan argues that his claim is not based on the denial, suspension, or revocation of his liquor license. Pl. Opp to St. Def. at 8. Rather, Mr. Quan asserts that "[h]e is seeking damages as a result of the State Defendants' actions in conducting a shoddy investigation into his license status, then conducting a full raid, on an incorrect pretext, into his club while he had an event going on." *Id.* Nevertheless, while Mr. Quan may be seeking to flesh out the theory behind his claim in his Opposition, he has failed to identify any statutory authority recognizing that the State Defendants may be liable on these theories. Having failed to identify any legal basis to support his claims, the Court **GRANTS** summary judgment in favor of the State Defendants on this ground, as well.

**D.     RICO Claim**

In their third cause of action, Plaintiffs assert a claim pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), against Defendants for unlawful enforcement of the Alcoholic Beverage Control Act. Compl. at 7-12. In their Complaint, Plaintiffs allege that Defendants have used a pattern of racketeering activity during the past year to intimidate and terrorize certain nightclub operators, party-goers, and party promoters, in order to effectuate an unlawful result

UNITED STATES DISTRICT COURT
For the Northern District of California

1    in violation of 18 U.S.C. § 1962(c). Compl. ¶ 15. Particularly, Plaintiffs allege that there have been

2    several incidents beginning in December 2008 where SFPD and the ABC, particularly Ofc. Bertrand and

3    Investigator Ott, have raided clubs or private venues without warrants or probable cause under the pretext

4    of finding liquor violations. Compl. ¶¶ 37-41.

5    Defendants now move for summary judgment on Plaintiffs' RICO claim. SF Def. Mot. at 13; St.

6    Def. Mot. at 22. The San Francisco Defendants first contend that entities such as the City and County

7    of San Francisco, the State of California, the San Francisco Police department, and government

8    employees in their official capacities, are immune from RICO liability. SF Def. Mot. at 14. The San

9    Francisco and State Defendants further contend that summary judgment is appropriate because Plaintiffs

10   have failed to come forward with evidence to support several elements of their RICO claim. *Id.* at 15;

11   St. Def. Mot. at 22-23. The Court will address each argument, in turn.

12         1.    <u>RICO Liability Against Government Defendants</u>

13   The San Francisco Defendants first argue that Plaintiffs' RICO claim a fails as a matter of law

14   because governmental entities are not subject to RICO liability as defendants because they are incapable

15   of forming the criminal intent necessary to commit predicate acts and cite *Lancaster Community Hospital*

16   *v. Antelope Valley Hospital District*, 940 F.2d 397, 404 (9th Cir. 1991) and *Pedrina v. Chun*, 97 F.3d

17   1296, 1300 (9th Cir. 1996), in support. SF Def. Mot. at 14. The San Francisco Defendants also argue

18   that the Supreme Court has repeatedly held that suits against a public official in his or her official

19   capacity equate to suits against the government itself and are therefore impermissible under RICO, and

20   cite *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989), *Karcher v. May*, 484 U.S. 72,

21   78 (1987), and *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985), in support. *Id.* Defendants accordingly

22   argue that Plaintiffs' RICO claims must be dismissed.

23   In their Opposition, Plaintiffs concede that under *Lancaster*, governmental entities such as the

24   City and County of San Francisco are not proper RICO defendants. Opp. to SF Def., Dkt. No. 59 at 9-10.

25   However, Plaintiffs maintain that *Lancaster* did not hold that individual government officials or

26   employees cannot be held liable under RICO. *Id.* Rather, Plaintiffs assert that in *Pedrina*, the court

27   allowed a RICO claim to proceed against the mayor. *Id.* Plaintiffs thus argue that while the City and

28

1  County of San Francisco is immune from RICO liability, Ofc. Bertrand is not. Plaintiffs do not make any

2  argument with respect to former Mayor Newsom.

3      To the extent that Plaintiffs argue that in *Pedrina* the court allowed the RICO claim against the

4  mayor to proceed, Plaintiffs are correct. However, in that case the plaintiffs alleged conduct by the

5  mayor outside of his official duties, namely taking bribes and aiding and abetting other defendants in a

6  mail fraud scheme. *See Pedrina*, 97 F.3d at 1300. Here, as Defendants point out, Plaintiffs have not

7  alleged any action taken by Ofc. Bertrand that was not taken on behalf of the City and County of San

8  Francisco. The same holds true for Plaintiffs' allegations regarding Investigator Ott and former Mayor

9  Newsom. Thus, Plaintiffs' allegations regarding these defendants all concern conduct taken in their

10 official roles. In such instances, "[s]uing a government official in his official capacity is the equivalent

11 of suing the government, and the government cannot form the requisite intent to be sued under RICO."

12 *Tate v. Bd. of Prison Terms*, 2010 WL 1980141, at *13 (C.D. Cal. April 9, 2010) (citing *Pedrina*, 97 F.3d

13 at 1300). Plaintiffs have not cited to any case law holding that a government employee could be held

14 liable under RICO for performing his or her official duties. Accordingly, the Court finds that Plaintiffs'

15 RICO claim against Ofc. Bertrand, Investigator Ott, and former Mayor Newsom is subject to dismissal.

16      2.      Elements of a RICO Claim Pursuant to 18 U.S.C. § 1962(c)

17      Defendants next argue that they are entitled to summary judgment on Plaintiffs' RICO claim

18 because Plaintiffs have failed to come forward with evidence to support essential elements of the claim.

19 The Court agrees.

20      Section 1962(c) makes it illegal for "any person employed or associated with any enterprise

21 engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate,

22 directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity."

23 18 U.S.C. § 1962(c). To state a civil claim for a RICO violation under § 1962(c), a plaintiff must show:

24 (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Rezner v. Bayerische*

25 *Hypo-Und Vereinsbank AG*, 630 F.3d 866, 873 (9th Cir. 2011). The San Francisco Defendants contend

26 that Plaintiffs have failed to identify evidence establishing: (1) the existence of an enterprise; (2) a pattern

27 of racketeering activity; or (3) that the racketeering activity caused an injury to Plaintiffs' business or

28

UNITED STATES DISTRICT COURT
For the Northern District of California

25

1    property.

2              a.      Enterprise

3        RICO defines "enterprise" as "any individual, partnership, corporation, association or other legal

4    entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.

5    § 1961(4).  An associated-in-fact enterprise is "a group of persons associated together for a common

6    purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981).  To

7    establish the existence of such an associated-in-fact enterprise, a plaintiff must provide: (1) evidence of

8    an ongoing organization, formal or informal; and (2) evidence that the various associates function as a

9    continuing unit.  *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007).

10        First, the San Francisco Defendants argue that Plaintiffs have failed to come forward with any

11   facts describing who made up the enterprise or how the enterprise functioned. SF Def. Mot. at 16.

12        Next, the San Francisco Defendants argue that Plaintiffs have failed to present evidence that a

13   formal or informal ongoing organization existed. *Id.*  They assert that, at most, Plaintiffs have shown that

14   Ofc. Bertrand and Investigator Ott coordinated their activities for the June 19, 2009 investigation at The

15   Room.  *Id.*  They argue that the commission of these acts on a single night does not amount to evidence

16   of an ongoing organization.

17        Third, the San Francisco Defendants assert that Plaintiffs have failed to present facts

18   demonstrating sufficient to satisfy the continuing unit requirement.  *Id.*  As explained in *Odom*, "[t]he

19   continuity requirement does not, in itself, require that every member be involved in each of the

20   underlying acts of racketeering, or that the predicate acts be interrelated in any way." 486 F.3d at 552

21   (internal quotations omitted).  Rather, "the continuity requirement focuses on whether the associates'

22   behavior was 'ongoing' rather than isolated activity."  *Id.* at 553.  Defendants argue that Plaintiffs have

23   not come forward with evidence sufficient to establish ongoing predicate racketeering acts.

24        In response, Plaintiffs maintain that the evidence creates a triable issue of fact on the enterprise

25   element.  Specifically, Plaintiffs submit:

26        The complaint, along with the declarations submitted herewith, allege that the City and
          County of San Francisco, by and through its elected officials, became concerned with
27        crime that was occurring in and around nightclubs.  It therefore put pressure on the Police
          Department to conduct enforcement actions in relation to nightclubs.  In furtherance of
28

                                                    26

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1     the policy, the SFPD worked in concert with the ABC, in an association but not as a "legal entity." Therefore, Plaintiffs have established the existence of an "enterprise," or

2     at the very least, have established an issue of material fact as to this issue. (Decl. of Rennie ¶¶ 24-27; Decl. of Ott & Decl. of Bertrand.)

3

4 Pl. Opp to SF Def. at 10. Reviewing Plaintiffs' proffered evidence, while Plaintiffs cite to Investigator

5 Ott's and Ofc. Bertrand's declarations, Plaintiffs do not specify which statements satisfy any of the

6 criteria necessary for an enterprise to exist. Further, the paragraphs cited in Mr. Rennie's Declaration

7 contain no facts as to how the Defendants constituted an associated-in-fact enterprise. Rather, Mr.

8 Rennie's statements are simply his opinion of about the relations between SFPD, the ABC and San

9 Francisco's nightclub industry in 2008 and 2009. Plaintiffs have pointed to no other facts or evidence

10 in the record relating to how the defendants coordinated their activities beyond the September 19, 2009

11 investigation at The Room or how the defendants associated as an ongoing and continuing unit and

12 engaged in activities to further a common purpose. Thus, the Court agrees with Defendants that Plaintiffs

13 have failed to identify any facts sufficient to meet the burden of establishing that an enterprise existed

14 sufficient to sustain their claim under § 1962(c).

15           *b.*    *Racketeering Activity*

16       To prevail on a claim pursuant to § 1962(c), a plaintiff must establish a pattern of racketeering

17 activity. Only a finite number of acts constitute actionable "racketeering activity" as defined by 18

18 U.S.C. § 1961(1). To allege an unlawful "pattern," Plaintiff must allege at least two acts of racketeering

19 activity. *See* 18 U.S.C. §§ 1961(1), (5). Here, Plaintiffs' allege predicate acts of mail fraud and

20 kidnapping. As indicated above, Mr. Magallon's kidnapping claim and Mr. Quan's mail fraud claim fail

21 as a matter of law. Plaintiffs have failed to identify any other facts in the record that qualify as a

22 racketeering activity under § 1961(1). Accordingly, the Court agrees with Defendants that Plaintiffs have

23 failed to establish a pattern of racketeering activity, which is fatal to Plaintiffs' RICO claim.

24           *c.*    *Effect on Interstate Commerce*

25       The San Francisco Defendants next argue that Plaintiffs have failed to identify facts

26 demonstrating that the enterprise's activity affects interstate commerce. SF Def. Mot. at 17. In response,

27 Plaintiffs point to allegations in their Complaint that the alleged pattern of racketeering activity had a

28

1   direct effect on interstate commerce, including the volume of interstate shipment of alcohol and

2   beverages to nightclubs and nightclub operators that have been victims of the pattern and has had a

3   chilling effect on the sale of those beverages by the intimidation on club operators and their clientele.

4   Compl. ¶ 16.  Plaintiffs, however, have come forward with no evidence to support these allegations.

5   Thus, the Court agrees with Defendants that Plaintiffs' claim fails on this basis, as well.

6               *d.*       *Injury to Business or Property*

7          The San Francisco Defendants contend that Plaintiffs have failed to set forth facts establishing

8   that any violation resulted in injury to their business or property.  SF Def. Mot. at 18-19.  As to Mr.

9   Magallon, Defendants argue that he has no interest in any business or property at issue, and therefore

10  could not have suffered injury to business or property.  In response, Plaintiffs argue that Mr. Magallon

11  has stated in his declaration that he suffered physical injuries as a result of the officers' actions and that

12  he was unable to return to work and therefore lost income. Pl. Opp to SF Def. Mot. at 11.

13         However, as the San Francisco Defendants correctly note, to the extent that Mr. Magallon has

14  alleged physical injuries and mental and emotional suffering, Defendants argue that the Ninth Circuit has

15  held that such injuries do not constitute a RICO "injury to business or property."  SF Def. Mot. at 18

16  (citing *Berg v. First Interstate Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990) ("personal injury, including

17  emotional distress, is not compensable under § 1964(c) of RICO.")  Likewise, *Berg* recognized that the

18  economic aspects of personal injuries, such as loss of earnings due to physical injury or emotional

19  distress, are not compensable under RICO.  The Court therefore agrees with Defendants that Mr.

20  Magallon has failed to establish that he suffered cognizable injuries under § 1964(c), which is fatal to

21  his RICO claim.

22         With respect to Mr. Quan, Plaintiffs argue that Mr. Quan has testified that as a result of the raid

23  on the nightclub, he suffered loss of business.  Pl. Opp to SF Def. Mot. at 11.  The San Francisco

24  Defendants do not proffer any argument in response on this issue.  The Court therefore finds that Mr.

25  Quan has met his burden to withstand summary judgment on this element.  Nevertheless, because

26  Plaintiffs have failed to established the other essential elements of their RICO claim, the claim is subject

27  to dismissal.

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

### 3.   Summary

In sum, the Court finds that because Defendants are not subject to RICO liability because they are government entities and because Plaintiffs have failed to identify facts supporting essential elements of the RICO claim, Plaintiffs' RICO claim fails.  The Court therefore **GRANTS** summary judgment in favor of all Defendants on this claim.

**E.   Claims Against Defendant Newsom**

The San Francisco Defendants argue that Plaintiffs have failed to come forward with any evidence regarding conduct by former Mayor Newsom with respect to any of Plaintiffs' claims.  SF Def. Mot. at 24.  They therefore urge the Court to dismiss all claims against him.  Plaintiffs fail to proffer any response to this argument and have not otherwise pointed to any evidence in the record concerning former Mayor Newsom.  Consequently, the Court **GRANTS** summary judgment in favor of former Mayor Newsom on all claims.

## V.   CONCLUSION

For the reasons set forth above, the Court **GRANTS** the San Francisco Defendants' Motion for Summary Judgment (Dkt. No. #41) and the State Defendants' Motion for Summary Judgment on all claims.

The Clerk of the Court is directed to enter Judgement in favor of Defendants on all counts.

**IT IS SO ORDERED.**

Dated: September 27, 2012

_____
Maria-Elena James
Chief United States Magistrate Judge

29